**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STARR INDEMNITY & LIABILITY COMPANY,
ENVIVA, LP and ENVIVA PELLETS
COTTONDALE, LLC,

                    Plaintiffs,

vs.

MS AMLIN SYNDICATE 2001 AT LLOYD'S OF
LONDON FOR THE 2016 YEAR OF ACCOUNT,
MITSUI SUMITOMO SYNDICATE 3210 AT
LLOYD'S OF LONDON FOR THE 2016 YEAR
OF ACCOUNT, MUNICH RE SYNDICATE 457
AT LLOYD'S OF LONDON FOR THE 2016
YEAR OF ACCOUNT and CERTAIN OTHER
SYNDICATES AY LLOYD'S OF LONDON
THROUGH DUAL UNDERWRITING LIMITED
AND PARTICIPATING UNDER THE BINDING
AUTHORITY WITH UMR B0429BA1502360,

                    Defendants.

19 CV 9487

**COMPLAINT**

       Plaintiffs Starr Indemnity & Liability Company, Enviva, LP and Enviva Pellets Cottondale, LLC, by and through their attorneys, as and for their Complaint against Defendants MS Amlin Syndicate 2001 at Lloyd's of London for the 2016 year of account, Mitsui Sumitomo Syndicate 3210 at Lloyd's of London for the 2016 year of account, Munich Re Syndicate 457 at Lloyd's of London for the 2016 year of account and certain other syndicates ay Lloyd's of London through Dual Underwriting Limited and participating under the binding authority with UMR B0429BA1502360 (all Defendants collectively, the "Cargo Underwriters"), allege the following upon information and belief:

## PARTIES

1.     Plaintiff Starr Indemnity & Liability Company was and is a corporation duly organized and existing under and by virtue of the laws of the State of Texas with a principal place of business in the State of New York.

2.     Starr Indemnity was and is an insurance company that was and is licensed to do business in the State of New York as a foreign insurer.

3.     Starr Indemnity is the assignee and the subrogated underwriter of Plaintiff Enviva, LP ("Enviva") and Plaintiff Enviva Pellets Cottondale, LLC ("Enviva Pellets") and is the subrogee of non-party Engie Energy Management SCRL.

4.     Defendants are those certain underwriters at Lloyd's of London subscribing severally to Marine Stock Throughput Insurance Policy Number B0180PC1633023 (the "Cargo Policy"), which provided coverage to Enviva, Enviva Pellets and Engie at all relevant times.

5.     Cargo Underwriters are comprised of underwriting syndicates based in the United Kingdom.

## JURISDICTION AND VENUE

6.     The following issues constitute questions of insurance coverage under a contract of marine insurance and thereby come within the admiralty and maritime jurisdiction of this Court pursuant to 28 U.S.C. § 1333 and are maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

7.     This action is filed under and pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201.

8.     An actual controversy of a justiciable nature exists between Plaintiffs and Cargo Underwriters involving the rights and obligations under the Cargo Policy and, depending on the

construction of said contract, the aforesaid controversy can be determined by a judgment of this Court without further suit.

9.     Cargo Underwriters have consented to jurisdiction in the State of New York by virtue of their agreement to a choice of forum clause in the Cargo Policy that requires that "[a]ny disputes arising under or in connection with [the Cargo Policy] shall be subject to the exclusive jurisdiction of the Courts of the United States of America."

10.     The Cargo Policy includes the Institute Service of Suit Clause (USA) Cl 355 dated 1.11.92, which names Mendes & Mount in New York, New York as Defendants' agent for service of process.

11.     Venue is proper in this District because Cargo Underwriters are subject to personal jurisdiction in this District with respect to this action.

12.     Venue is also proper in this District because the Cargo Policy calls for the parties thereto to submit to the exclusive jurisdiction of the Courts of the United States of America.

## UNDERLYING FACTS – THE CARGO POLICY

13.     The Cargo Policy insured Enviva, Enviva Pellets and others under certain terms and conditions with a policy period running from March 16, 2016 to March 15, 2017.

14.     The Insured clause in the Cargo Policy states: "Enviva Holdings LP and/or affiliated and/or interrelated and/or subsidiary companies and/or corporations as they now are or may hereafter be created and/or constituted and/or for whom the Insured receive instructions to insure and/or for whom the Insured have or assume a responsibility to arrange insurance contractually, as their respective rights and interest may appear hereinafter known as the Insured."

3

15.     Enviva, LP and Enviva Pellets Cottondale, LLC are and were at all relevant times affiliated and/or interrelated and/or subsidiary companies and/or corporations of Enviva Holdings LP.

16.     The Interest clause in the Cargo Policy states: "All interests of every description related to the Insured's business consisting principally of but not limited to wood pellets of all descriptions, pellet manufacturing equipment of all descriptions and/or all other interests handled by the Insured during the course of their business or in their care, custody or control."

17.     The Duration of Coverage clause in the Cargo Policy states that "the insurance hereunder attaches from the time the subject-matter becomes at the insured's risk … and continues whilst the subject matter is in transit and/or in store or elsewhere, … and until the insured's risk and/or interest ceases."

18.     The Voyage / Indemnity clause in the Cargo Policy states: "This insurance attaches from the moment the insured receives or obtains insurable interest in the goods and/or raw materials insured here under, then continues during any loading and or domestic transit in the United States, thence whilst being loaded onto barges and whilst shipped on barges in the United States, then continues whilst barges await transhipment onto ocean vessels for a period of up to one-hundred and twenty (120) days, including during transhipment, then including during shipments worldwide on ocean going vessels and additionally storage during the course of ordinary transit or otherwise at owned or third party locations for a period of up to sixty (60) days.  This insurance specifically includes where title has transferred but Interest is still under the Care, Custody or Control of the Insured and where the Insured is contractually obligated to provide insurance for the Insured Interest."

19.     The Deviation Extension clause in the Cargo Policy states: "… [I]n the event of … change of voyage, or any interruption or other variation of the voyage or risk beyond the control of the Insured …, this insurance shall nevertheless cover the goods until arrival at the final destination named in the declaration or certificate of insurance or until the subject-matter insured is no longer at the risk of the Insured, whichever may first occur, provided prompt notice is given to the insurer when such facts are known to the Insured."

20.     The Return Shipment Extension clause in the Cargo Policy states: "In the event of refusal or inability of the Insured or the consignee to accept delivery of shipments insured hereunder, this insurance is extended to cover such shipments, subject to the original insured value and insuring Conditions, during delay and/or return or until otherwise disposed.  The Insured agrees to report the facts of such situations as soon as practicable after they have knowledge of them."

21.     The Limits of Liability clause in the Cargo Policy states, among other things, that there is a "USD 11,000,000 limit of liability for each and every loss any one Conveyance …."

22.     For transit losses, the deductible under the Cargo Policy is "0.5% of whole shipment value."  The Cargo Policy also states that, "[n]otwithstanding the foregoing, claims recoverable under Institute Cargo Clauses (C), General Average, Removal of Debris Extension and claims for Salvage and Sue Labour Charges shall be payable in full irrespective of percentage of the valuation."

23.     In addition to coverage for physical loss or damage to the interest insured, the Cargo Policy also pays for certain costs and expenses through certain extensions of coverage.

24.     The extensions of coverage under the Cargo Policy include the following:

EXPENSES FOR PROPERTY SAFEGUARDING EXTENSION

Notwithstanding any provision to the contrary stated herein, in the event of an insured peril, where such Occurrence gives rise to a physical damage claim under this policy, this policy is extended to cover expenses necessarily and reasonably incurred by the Insured to safeguard, preserve and protect the property insured from being damaged or destroyed, to safeguard, preserve and protect the property that, not having been damaged, may be affected by any of the risks covered, and the value of temporary contracts for holding insured property, equipment and machinery.   This coverage is limited by the Limit of this insurance and shall be considered as the same Occurrence as the corresponding physical damage claim.

EXTRA EXPENSE CLAUSE

It is understood and agreed that, following the operation of an insured peril, where extra expense are incurred to destroy or otherwise dispose of the damaged goods, or in the event of damage to the subject-matter insured any reasonable additional expenses incurred, including any additional costs incurred for the procurement of replacement product, of a like quality to satisfy existing or future obligations to customers or where extra expenses are incurred to discharge from the vessel and/or craft and/or conveyance or to forward property to original or substitute final destination such expenses will be recoverable in full in addition to the damage to the insured interest.  This coverage is also to include extra and fixed expenses reasonably incurred as a result of one more location at which inventory coverage is provided, being unable to continue to perform their operations as a result of a peril insured against under this policy.  Underwriters shall not be liable under this coverage for more than USD 1,000,000 each and every loss and in the annual aggregate.

REMOVAL OF DEBRIS EXTENSION

It is agreed that subject to the operation of an insured peril, underwriters will pay costs and expenses reasonably incurred by the Insured in connection with:

(1) removal of debris and/or destruction of damaged goods;

(2) the transfer of items covered hereunder from one conveyance to another in the event of an accident to the original conveyance which results in loss of or damage to such items which is recoverable hereunder.

6

The indemnity provided by this clause shall be in addition to the indemnity provided elsewhere herein but limited to a further 10% of the insured value of the goods lost or damaged.

SUE AND LABOUR EXTENSION

In case of any imminent or actual loss or misfortune, it shall be lawful and necessary to and for the insured, his or their factors, servants and assigns, to sue, labour and travel for, in and about the defence, safeguard and recovery of the said property, or any part therefore without prejudice to his insurance; nor shall the acts of the Insured of insurer in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of abandonment; to the charges whereof the said insurer will contribute according to the rate and quantity of the sum herein insured.

TESTING, SORTING AND SEGREGATION EXTENSION

In the event of external signs of damage to the subject-matter insured Underwriters agree to meet the reasonable cost of testing, sorting and segregating the subject-matter including any surveyor's fees and additional storage charges whether or not any actual damage is subsequently found, including the costs of transporting the subject-matter to or from a test facility plus the costs of repacking and shipment to destination after completion. Any such costs shall be paid in full without application of any applicable policy deductible or excess.

SURVEY FEES EXTENSION

In the event of the Insured or consignee complying with the instruction contained in this contract or on the certificate of insurance to call for a survey in respect of loss or damage or suspected loss or damage which may result in a claim hereunder, reasonable expenses incurred and fees charged in respect of that survey are for Underwriters' account even though a claim may not subsequently result hereunder.  All expenses relative to surveying performed by Vericlaim or any other surveyor of the Insured's choosing, shall be paid in full by underwriters and these fess shall not be subject to the Policy deductible.

25.     While certain extensions of coverage under the Cargo Policy are subject to a

sublimit of liability (*e.g.*, the Extra Expense Clause is subject to a $1 million sublimit; the Removal

of Debris Extension is subject to a sublimit of 10% of the insured value of the damaged cargo),
other coverage extensions (*e.g.*, Expenses for Property Safeguarding Extension; Sue and Labour
Extension) have no stated sublimit of liability.

26.     The Adjusted Claims Extension clause in the Cargo Policy states: "Loss, if any,
payable as provided herein, within thirty (30) days after filing proof of loss for adjusted claims."

27.     The Choice of Law and Jurisdiction clause in the Cargo Policy states: "The proper
and exclusive law of this insurance shall be Mississippi law.  Any disputes arising under or in
connection with it shall be subject to the exclusive jurisdiction of the Courts of the United States
of America."

## UNDERLYING FACTS – THE STARR POLICIES

28.     Starr Indemnity insured Enviva, Enviva Pellets and others under the terms and
conditions of Charterer's Legal Liability Policy No. MASILBN00051616 ("Starr Indemnity
Primary Policy") with a policy period running from March 15, 2016 to March 15, 2017.

29.     The Charterer's Liability section of the Starr Indemnity Primary Policy covered "the
legal and/or contractual liability of the Assured as Charterer ... in respect to the vessel(s) insured
hereunder for any loss, damage and/or expense including but not limited to demurrage ... and/or
any other consequential loss or damage, resulting from any accident in which said vessel(s) may
be involved."  This coverage included protection and indemnity risks as defined in Protection and
Indemnity Form SP-23 (Revised 1/56).

30.     Starr Indemnity also insured Enviva, Enviva Pellets and others under the terms and
conditions of Excess Marine Liabilities Policy No. MASILBN00036416 ("Starr Indemnity Excess
Policy") with a policy period running from March 15, 2016 to March 15, 2017.

31. The Starr Indemnity Excess Policy provided, among others, Excess Charterer's Legal Liability coverage. This particular coverage is triggered where the assured's liability for an occurrence "exceeds the Limits of Liability of the [scheduled underlying Charterer's Legal Liability policy]" and then "only for the amount by which such liability exceeds such underlying Limits of Liability, but in no event for more than the Limit of Liability of [the Excess Policy]."

32. The Starr Indemnity Primary Policy was the scheduled underlying Charterer's Legal Liability policy under the Starr Indemnity Excess Policy.

## UNDERLYING FACTS – THE CASUALTY

33. Lauritzen Bulkers A/S, as owner, and Green Circle Bio Energy Inc., as charterer, were parties to a contract of affreightment (the "COA") dated October 21, 2014 that was on an amended GENCON form with rider clauses.

34. Green Circle Bio Energy Inc. is now known as Enviva Pellets Cottondale, LLC.

35. Enviva Pellets sold a consignment of Biomass to Drax Power Limited on CIF (Cost, Insurance and Freight) terms to be loaded at Panama City, Florida and delivered to a port in the United Kingdom.

36. The M/V V DUE (the "Vessel") was nominated by Lauritzen on or about September 14, 2016 pursuant to the COA to perform the voyage from Panama City to the United Kingdom.

37. The Vessel loaded a cargo of approximately 29,424 MT of Biomass in bulk between September 21 and 30, 2016.

38. The cargo was carried under Bill of Lading No. 1 issued at Panama City and dated September 30, 2016.

39.     Bill of Lading No. 1 identified Enviva Pellets as the shipper, Drax as the consignee and three ports in the United Kingdom, including Liverpool, as the discharge port.  Liverpool was ultimately nominated as the discharge port.

40.     The V DUE arrived at Liverpool on October 18, 2016 but did not berth until November 10, 2016.

41.     "Initial inspection of cargo within all five hold compartments found the cargo to be wet / damp from ship sweating due to heat of product and moisture within hold compartments causing condensation to form in air space between cargo surface and steel hatch covers above." (SGS Discharge Report)

42.     Discharge began from Hold 3 on November 10, 2016 but was stopped shortly thereafter because of high cargo temperatures.

43.     Cargo was subsequently discharged from Holds 2 and 4 on November 10, 2016 but high cargo temperatures were experienced in those holds as well.

44.     Cargo was discharged from Hold 5 on November 11, 2016 but high cargo temperatures were also experienced in that hold.

45.     All involved parties were notified "about the issue with the sub-standard cargo and a discharge plan was put in place to discharge all sub-standard cargo from vessel and have it stored separate from rest of good standard cargo." (SGS Discharge Report)

46.     Discharge operations continued on November 14, 2016 and samples were taken for sizing.  "Based upon results of sizing test Drax (receivers) could make decision on whether they would like to continue receiving cargo." (SGS Discharge Report)

47.     On November 15, 2016, "Drax (Receivers) refused to take more cargo from vessel." (SGS Discharge Report)

48.     Enviva and/or Enviva Pellets decided on November 16, 2016 to discharge approximately 800 MT more of the cargo from Holds 1, 4 and 5 to remove sub-standard cargo.

49.     "These 800 metric tonnes were discharged from the vessel to adjust trim and list for vessel stability and to prepare on board stowage of cargo for new receivers when allocated." (SGS Discharge Report)

50.     Discharge operations were completed either on November 16, 2016 or on November 20, 2016.

51.     The V DUE departed Liverpool on or about November 20, 2016 and anchored off of Anglesey to await instructions as to the disposition of the cargo remaining on the Vessel.

52.     The remaining cargo was repurchased by Enviva Pellets from Drax pursuant to a Third Amended Agreement dated November 30, 2016.

53.     The cargo remaining on the Vessel was resold by Enviva to Engie on CIF (Cost, Insurance and Freight) terms under contract dated November 30, 2016 with Ghent identified as the discharge port.

54.     By virtue of the sale of the cargo to Engie on CIF terms, Engie was an "Insured" under the Cargo Policy at all relevant times.

55.     No new bills of lading were issued in connection with the sale of the cargo by Enviva to Engie.

56.     Enviva and/or Enviva Pellets continued to have an interest in the cargo after the sale to Engie, which interest did not cease any earlier than discharge of the cargo at Rotterdam in or about February 2017.

57.     Skuld advised on November 30, 2016: "The Master reports that Hold No. 5 is still venting smoke, steam and gases.  This being the case, a 2/3 day passage through the English

Channel and to Ghent, may not be appropriate at this stage with the cargo in no.5 continuing to combust.  ... Owners' surveyor suggests that off-loading in either Liverpool or another Irish Sea port should be prioritised rather than considering sending the vessel on a protracted sea passage where outside assistance may not be available." (Peter Hazell e-mail dated November 30, 2016)

58.     Smoldering/fire was reported in Hold 5 on or about December 1, 2016.

59.     An exclusion zone was established around the Vessel on or about December 2, 2016.

60.     The Vessel owner ("head owners") declared general average on or about December 2, 2016.

61.     The Vessel returned to Liverpool on or about December 9, 2016 to discharge cargo from Hold 5 on an emergency basis.

62.     The cargo in Hold 5 was discharged at Liverpool and the emergency in that hold was deemed to be over by about December 16, 2016.

63.     With regard to the cargo remaining on the Vessel, Enviva determined that Rotterdam was the preferred discharge port.

64.     The departure of the Vessel from Liverpool and the voyage to Rotterdam were the subject of discussions and negotiations between and among Enviva, Lauritzen, the other Vessel interests, governmental authorities (SOSREP) and port authorities through February 3, 2017.

65.     The Vessel loaded additional, new Biomass into Hold 5 at Liverpool sometime between February 3, 2017 and February 14, 2017.

66.     Two, new bills of lading were issued on or about February 13, 2017 for the carriage of the cargo from Liverpool to Rotterdam.

67.     Bill of Lading One and Bill of Lading Two identified Enviva Pellets as the shipper, Engie as the consignee, Liverpool as the port of loading and Rotterdam as the port of discharge.

68.     The Vessel departed Liverpool for Rotterdam on or about February 14, 2017.

69.     The entire cargo was ultimately discharged at Rotterdam.

### UNDERLYING FACTS – THE ARBITRATION

70.     Lauritzen served a notice of arbitration on Enviva Pellets on or about December 16, 2016 appointing an arbitrator in respect of any and all disputes arising under the COA.  There were related arbitration proceedings against Lauritzen by the head time charterers and against the head time charterers by the head owners.

71.     Lauritzen essentially sought indemnity from Enviva Pellets for any damages that Lauritzen was required to pay as a result of the claims by those higher up the charter party chain (*i.e.*, head time charterers and head owners).  These claims related to the smoldering/fire in Hold 5, the emergency discharge of the cargo from Hold 5, the disposal of the damaged cargo and the physical damage to the V DUE.  The alleged damages amounted to approximately $12 million in quantified damages and included ports charges, disposal charges, survey fees, agency fees, salvage experts, emergency services, repair costs and class fees.

72.     Head owners claimed for, among other things, the following costs and expenses that it incurred arising out of the V DUE casualty:

| | | |
|---|---|---|
| (a) | Port charges and payments to Peel Ports | £ 7,057,759.54 |
| (b) | Brookes Bell | £ 128,617.28 |
| (c) | MCA and other response costs | £ 311,410.01 |
| (d) | SMIT costs | € 122,041.77 |
| (e) | AW Jenkinson | £ 714,928.40 |

73.     These costs and expenses were for and related to, among other things, the emergency discharge of the distressed cargo from Hold 5, the preservation and safeguarding of the

remaining cargo, the disposal of the damaged cargo, and the procurement and loading of the replacement cargo.

74.     Enviva, Enviva Pellets and/or Engie were responsible as the owner and/or the shipper of the cargo for some or all of the above costs and expenses.

75.     Enviva and/or Enviva Pellets submitted a claim to Starr Indemnity under the Starr Indemnity Primary Policy and the Starr Indemnity Excess Policy for the above costs and expenses.

76.     Enviva and/or Enviva Pellets also submitted a claim to Cargo Underwriters under the Cargo Policy for some or all of the above costs and expenses.

77.     Enviva Pellets and Starr Indemnity participated in a mediation on December 18, 2018 in connection with the arbitration that resulted in a settlement under which Starr Indemnity paid $10,750,000 to head owners on behalf of Enviva Pellets for, among other things, the above costs and expenses.

78.     Cargo Underwriters were invited, but declined, to participate in the mediation.

79.     Starr Indemnity also indemnified Enviva and Enviva Pellets for certain fees and costs in the amount of $1,100,600.25 for legal and other services that were provided to Enviva and Enviva Pellets in connection with the V DUE casualty.

80.     Certain of the fees and costs for legal and other services that were indemnified by Starr Indemnity were for the defense, safeguard and preservation of the cargo.

81.     In connection with the settlement of the arbitration, Enviva and Enviva Pellets assigned to Starr Indemnity all rights and claims they have under the Cargo Policy arising out of the above costs, expenses and fees.  A true and correct copy of the Subrogation Receipt and Assignment is attached hereto as Exhibit "1."

82.     Starr Indemnity is contractually and/or equitably subrogated to Enviva's, Enviva Pellets' and/or Engie's rights and claims under the Cargo Policy by virtue of its payment of the above costs, expenses and fees.

83.     Plaintiffs seek a recovery under the Cargo Policy for the above costs, expenses and fees.

84.     A claim under the Cargo Policy for the above costs, expenses and fees was submitted with supporting documents to Cargo Underwriters on behalf of Starr Indemnity on or about July 30, 2019 care of counsel for Cargo Underwriters.  Cargo Underwriters were asked, through counsel, to advise of any additional information or documents required to process the claim for payment.

85.     Cargo Underwriters did not respond to the claim submitted on behalf of Starr Indemnity on July 30, 2019.

86.     Cargo Underwriters have disputed liability under the Cargo Policy for the claimed costs, expenses and fees.

87.     It has been more than thirty days since a claim was submitted under the Cargo Policy, and Cargo Underwriters have not paid any of the claimed costs, expenses or fees.

## AS AND FOR A FIRST CAUSE OF ACTION

88.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "87" of this Complaint with the same force and effect as if more fully set forth herein.

89.     The Expenses for Property Safeguarding Extension, the Sue and Labour Extension, and/or the Testing, Sorting and Segregation Extension, in whole or in part, provide coverage for all or some of the costs incurred to discharge the distressed cargo at Liverpool on an emergency

basis.  These include the costs and expenses in categories (a), (b), (c) and (d) in paragraph 72 above.

90.     Therefore, Plaintiffs are entitled to a judgment declaring that there is coverage under the Cargo Policy for the claimed costs and expenses.

## AS AND FOR A SECOND CAUSE OF ACTION

91.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "90" of this Complaint with the same force and effect as if more fully set forth herein.

92.     The Removal of Debris Extension, in whole or in part, provides coverage for all or some of the costs incurred to dispose of the damaged cargo at Liverpool.  These include the costs and expenses in categories (a), (b), (c) and (e) in paragraph 72 above.

93.     Therefore, Plaintiffs are entitled to a judgment declaring that there is coverage under the Cargo Policy for the claimed costs and expenses.

## AS AND FOR A THIRD CAUSE OF ACTION

94.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "93" of this Complaint with the same force and effect as if more fully set forth herein.

95.     The Extra Expense Clause, in whole or in part, provides coverage for all or some of the costs incurred to procure and to load replacement cargo at Liverpool.  These include the costs and expenses in category (a) in paragraph 72 above.

96.     Therefore, Plaintiffs are entitled to a judgment declaring that there is coverage under the Cargo Policy for the claimed costs and expenses.

## AS AND FOR A FOURTH CAUSE OF ACTION

97.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "96" of this Complaint with the same force and effect as if more fully set forth herein.

98.     The Expenses for Property Safeguarding Extension, the Sue and Labour Extension, and/or the Testing, Sorting and Segregation Extension, in whole or in part, provide coverage for all or some of the costs and expenses in categories (a), (b), (c), (d) and (e) in paragraph 72 above.

99.     Therefore, Plaintiffs are entitled to a judgment declaring that there is coverage under the Cargo Policy for the claimed costs and expenses.

## AS AND FOR A FIFTH CAUSE OF ACTION

100.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "99" of this Complaint with the same force and effect as if more fully set forth herein.

101.    The Sue and Labour Extension provides coverage for all or some of the fees and costs for the legal and other services that were provided to Enviva and Enviva Pellets in connection with the V DUE casualty that were indemnified by Starr Indemnity.

102.    Therefore, Plaintiffs are entitled to a judgment declaring that there is coverage under the Cargo Policy for the claimed fees and costs.

## AS AND FOR A SIXTH CAUSE OF ACTION

103.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "102" of this Complaint with the same force and effect as if more fully set forth herein.

104.    Starr Indemnity, Enviva, Enviva Pellets and/or Engie complied fully with all of the terms and conditions of the Cargo Policy and fulfilled each obligation on their part to be performed, except those that have been excused and/or waived.

105.    Cargo Underwriters have breached their contractual duties under the Cargo Policy by failing to pay the claimed costs, expenses and fees.

106.    As a direct and proximate result of Cargo Underwriters' breach of contract, Plaintiffs have been injured and damaged in an amount not less than $7.5 million.

107.    As a further direct and proximate result of Cargo Underwriters' breach of contract, Plaintiffs have been forced to incur and will continue to incur consequential damages, including, without limitation, attorneys' fees and other expenses in bringing this action, which damages are not subject to the limits of liability set forth in the Cargo Policy.

**WHEREFORE**, Plaintiffs Starr Indemnity & Liability Company, Enviva, LP and Enviva Pellets Cottondale, LLC pray as follows:

A.    For judgment on the FIRST through FIFTH CAUSES OF ACTION in favor of Plaintiffs and against Defendants declaring that there is coverage under the Cargo Policy for the claimed costs, expenses and fees;

B.    For judgment on the SIXTH CAUSE OF ACTION in favor of Plaintiffs and against Defendants awarding Plaintiffs damages in an amount to be determined at trial; and

C.    For such other and further relief as the Court deems just and proper under the circumstances, together with the costs and disbursements of this action.

Dated: New York, New York
        October 14, 2019

NICOLETTI HORNIG & SWEENEY
*Attorneys for Plaintiffs*


By:    S/ John A.V. Nicoletti
       John A.V. Nicoletti
       Nooshin Namazi
       Kevin J.B. O'Malley
       Wall Street Plaza
       88 Pine Street, Seventh Floor
       New York, New York 10005
       (212) 220-3830

18